UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| LASHERIL SURRATT, | ) | |
| | ) | Case No. 08 C 6588 |
| Plaintiff, | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff LaSheril Surratt seeks judicial review of a final decision denying her application for Supplemental Security Income ("SSI") benefits. Ms. Surratt has filed a Motion for Summary Judgment and seeks a judgment reversing or remanding the Commissioner's final decision. For the reasons set forth below, Ms. Surratt's motion is granted and this case is remanded for further proceedings [dkt 22].

PROCEDURAL HISTORY

On March 21, 2006, Ms. Surratt filed an application for SSI benefits for a period of disability beginning January 27, 1998.[1] She alleged that "asthma, extra rib on shoulder and locked bowels" limited her ability to work, and that she could not "breath [sic] good."[2] Subsequent to her initial application, Ms. Surratt filled out several additional disability reports alleging that her balance was

---

[1]R. at 15.

[2]R. at 159.

deteriorating and that her left side was weaker than her right and kept "going out."[3] She also alleged an enlarged heart.[4]

Ms. Surratt's claim was denied initially on July 26, 2006, and upon reconsideration the following day.[5] On September 26, 2007, she filed a timely written request for a hearing before an Administrative Law Judge ("ALJ").[6] A hearing was held on May 12, 2008, and ALJ Regina Kossek issued her final decision on June 27, 2008.[7] Ms. Surratt timely filed a Request for Review of Hearing Decision on August 19, 2008, and the Appeals Council denied review on September 17, 2008.[8]

### A. Background and Medical Evidence

The facts set forth in this subsection are derived from the medical record reviewed by the ALJ. They provide a brief history of Ms. Surratt's background and the events which led to her application for SSI.

Ms. Surratt was born on July 28, 1969, making her 38 years of age at the time of the ALJ's decision.[9] She completed high school and received a degree from a four-year college.[10] She currently lives with her mentally handicapped brother, who is receiving SSI benefits.[11] Her brother

---

[3]R. at 108-09, 148.

[4]R. at 148.

[5]R. at 15.

[6]R. at 73.

[7]R. at 12, 418.

[8]R. at 5, 8.

[9]R. at 125.

[10]R. at 425.

[11]R. at 425, 213.

assists her with housework, meal preparation and grooming. Ms. Surratt has been attempting to find a care facility which will take her brother, but to date has been unable to do so.[12]

### 1. January 1998-October 2005

There are no medical records in Ms. Surratt's application for SSI for the period between January 1998 and October 2005. This period is nonetheless important because Ms. Surratt claims that her disability began in January of 1998. Despite the paucity of records specific to this time period, information about these years can be extrapolated from subsequent records. For example, reference is made to ongoing treatment for pre-existing conditions. According to her application and medication lists, Ms. Surratt has had bronchial asthma for decades.[13] She also has prescriptions for medication to treat iron-deficiency anemia, osteopenia (low bone mineral density), allergic rhinitis and chronic constipation.[14] She also has a goiter.[15] Her disability claim is not specifically related to these conditions, but their aggregation exacerbates her difficulty with life activities and must be considered in formulating an opinion as to her disability.

During this time, it is possible that Darryl Woods, M.D., was Ms. Surratt's primary treating physician. Ms. Surratt reports having seen Dr. Woods since age 18, which would mean that she first saw him in 1987.[16] Dr. Woods himself, however, reports a different initial treatment date: either May 4, 1998, (as stated in the Medical Evaluation he prepared for the Illinois Department of Human Services)[17] or April, 2006 (as stated in the Physical Residual Functional Capacity Questionnaire he

---

[12]R. at 425-26.

[13]R. at 247.

[14]R. at 247-48, 349.

[15]R. at 412.

[16]R. at 446.

[17]R. at 395.

prepared on January 30, 2008).[18]  No explanation has been given for this discrepancy by either Dr. Woods or Ms. Surratt.

Ms. Surratt's sole work history also comes from this time period.  Although she claims in an undated disability report that she first became unable to work on January 27, 1998, later in the same report she indicates that she worked as a school teacher from November 1998 through August 13, 1999, and that her condition did not cause her to work fewer hours or change her job duties.[19]  This is the only job she reports having held, and certain details about her work are unclear.  For example, Ms. Surratt has reported various and inconsistent reasons for leaving employment.  She has alleged that she required consistent "breathing treatment" on the job, but also that the school ran out of funding and could no longer pay her.[20]  She has also stated that one reason she is currently unemployed is that she has been unable to find other employment which would allow her brother to accompany her.[21]

### 2. The 2005 Illness

In October of 2005, Ms. Surratt began experiencing tingling, pain and numbness in her left side.[22]  In December of 2005, she had an episode wherein her left side became paralyzed temporarily.[23]  She has not indicated whether this "paralysis" was momentary or prolonged.  Since

---

[18]R. at 446.

[19]*Id.*

[20]R. at 160, 214, 425.

[21]R. at 22.

[22]R. at 148, 401.

[23]R. at 401.

that time, she claims to have had episodic left-sided weakness and balance problems of increasing severity.[24]

Because Ms. Surratt filed her first application for SSI benefits in early 2006, from that time she was following three concurrent tracks of medical care.[25]  The first track was with Dr. Woods, who continued to evaluate and attempt to diagnose her condition, including sending her for physical and neurological tests.[26]  The second track was with physical and occupational therapists, apparently at John H. Stroger, Jr. Hospital (the therapy notes say only Stroger, Clinic/Outpatient) (hereinafter "Stroger"), who attempted to therapeutically restore Ms. Surratt's ability to function.[27]  The third and final track of medical care was with physicians and psychologists working with the State of Illinois to make a disability determination.

a.  **Dr. Woods' Evaluations and Physical Therapy Treatment**

From early 2005 through the present, Ms. Surratt received medical care both from Dr. Woods and from therapists at Stroger.  Ms. Surratt reports that although she began experiencing the new symptoms, including paralysis, in late 2005, she did not see Dr. Woods until January of 2006, because she had already made an appointment to see Dr. Woods in January and because the doctor was on vacation in December.[28]  The first time Dr. Woods reported seeing Ms. Surratt, however, is in April of 2006.[29]

---

[24]R., *passim*.

[25]R. at 15.

[26]R. at 366.

[27]R. at 253-275.

[28]R. at 428-29.

[29]R. at 446.

On April 27, 2006, Dr. Woods ordered blood tests, which were completed at ACHN/Westside Health Center ("ACHN") with inconclusive results.[30] During testing, Ms. Surratt complained of loss of balance, reduced strength on her left side, headaches, and swollen ankles; she weighed 229.9 pounds.[31]

On June 5, 2006, Ms. Surratt had a follow-up appointment from her bloodwork at ACHN. Clinic notes show that Ms. Surratt was still complaining of dizziness and headaches, and used a walker to correct her unsteady gait.[32] A Romberg test was administered, with positive results.[33] Romberg tests are administered by asking the patient to stand independently, with feet slightly separated and stable, and then close his or her eyes.[34] In some cases, the patient's head may be tilted back.[35] A "positive result" in a Romberg test means that the patient was unable to maintain a stable balance with closed eyes; that is, the patient swayed or fell when visual input was removed.[36] Positive Romberg results are objective neurological findings that indicate instability.[37]

Throughout June of 2006, Dr. Woods continued to send Ms. Surratt for tests. On June 21, a pulmonary function study, disclosed a "mild restrictive defect" and shortness of breath.[38] Medical records from this date also show edema, or swelling, in Ms. Surratt's legs.[39] A CT scan completed

---

[30]R. at 336, 346.

[31]*Id.*

[32]R. at 335.

[33]*Id.*

[34]Khasnis A, Gokula, *Romberg's Test.* 2003 J Postgrad Med 49, 169.

[35]*Id.*

[36]*Id.*

[37]R. at 452.

[38]R. at 292.

[39]R. at 319.

at Stroger on June 28 was inconclusive, with the final analysis being to "recommend [an] MRI in this patient with multiple documented neuro defects."[40]

On August 11, 2006, Ms. Surratt began physical and occupational therapy at Stroger with the goal of being able to comb her own hair and resume hobbies.[41] Ms. Surratt's condition had deteriorated to the point where a shoulder evaluation at Stroger showed a reduced grip strength of 50% on the left.[42] She reported headaches, chest pain, and sharp pains.[43] Her intake notes suggest that the interviewer (whose name on the intake notes is illegible) believed that the symptoms may be partially mental, due to "new home/care situation."[44]

Throughout September of 2006, Dr. Woods recommended more testing for Ms. Surratt. On September 6, an MRI was performed on her brain, but not her spinal cord.[45] The results were "unremarkable."[46] On September 8, 2006, Ms. Surratt attended physical therapy at Stroger complaining of pain in her left shoulder.[47] This was the last time Ms. Surratt came to physical therapy in 2006, and the 2006 therapy appears to have been confined to addressing her shoulder problems. At this time, Ms. Surratt was issued a hemi-cane, also called a hemi-walker, which is a specialized four-point walker designed for use with one hand.[48] (Ms. Surratt had previously been

---

[40]R. at 289.

[41]*Id.*

[42]R. at 314-16.

[43]R. at 314.

[44]R. at 317.

[45]R. at 287.

[46]*Id.*

[47]R. at 318.

[48]*Id.*, Tideiksaar, Rein, *Falls in Older People: Prevention and Management* 71(3d ed., Baltimore: Health Professions Press 2002).

using an ordinary walker to assist her with balance, but it was inappropriate for two reasons: first, it had been her grandmother's and not properly fitted to her, and second, it required lifting with both hands.[49]  As a mobility device, the hemi-cane falls between the four-point "quad cane" and the classic walker for stability assistance.[50]  Its broader base provides greater stability than a quad cane, but its lighter frame makes it less difficult to transport and use than an ordinary walker.[51]  Finally, on September 15, 2006, Ms. Surratt underwent an echocardiogram, which also did not disclose abnormalities.[52]  Although her condition was still deteriorating, a definitive diagnosis continued to elude Dr. Woods.

By the end of 2006, neither the therapy nor the testing Ms. Surratt had undergone since October 2005 had provided a reason for or a method of treating her symptoms.  Medical records from late 2006 through early 2007 show that Ms. Surratt's weight increased to 243 pounds, and that she continued to have left-side weakness and balance issues.[53]  Attempts were made to adjust her medication, with no conclusive results, and Dr. Woods prescribed another course of therapy and testing during the following year.

In January of 2007, Ms. Surratt returned to physical therapy to try to deal with her balance issues.  On intake, she complained of pain and stated that she was now falling 3-4 times daily.[54]  She had an unsteady gait and complained of decreased sensation in her left side.[55]  A Berg balance test

---

[49]R. at 317.

[50]Tideiksaar, *Falls in Older People: Prevention and Management* at 71.

[51]*Id.*

[52]R. at 284-86.

[53]R. at 333-34.

[54]R. at 306-08.

[55]*Id.*

was administered, and Ms. Surratt scored 45 out of 56 possible points.[56] The Berg balance score is determined by observing a patient performing a series of tasks including standing, turning, stooping, and climbing.[57] It is used to assess fall risk; a score of 45 is the minimum for independent ambulation, and patients scoring 20 or below are considered an extremely high fall risk.[58]

Ms. Surratt continued to visit both ACHN and physical therapy throughout early 2007, but despite her continued complaints, objective medical evidence and a definitive diagnosis continued to elude her care providers. ACHN notes from February 6, 2007, show "no evidence of neurologic disease, suspect functional etiology."[59] Physical and occupational therapy notes throughout February and March of 2007 show repeated complaints of pain and weakness, but inconsistent presentation during actual testing.[60]

Ms. Surratt's condition continued to deteriorate, although it still fluctuated. In one therapy session, Ms. Surratt marched on a trampoline, but she also suffered a near-collapse in the gymnasium during the same session.[61] By April 20, the physical therapist had begun to suspect that Ms. Surratt's symptoms might be psychological in origin.[62] On May 2, 2007, she had no pain at her occupational therapy class, but by May 9, she was in enough pain to cry during a grooming exercise.[63] On May 23, while attending a cerebrovascular accident awareness class at Stroger, she

---

[56]R. at 253.

[57]K. Berg et al., *The Balance Scale: reliability assessment for elderly residents and patients with an acute stroke*, 27 Scandinavian Journal of Rehabilitation Medicine, 27-36 (1995).

[58]*Id.*

[59]R. at 312.

[60]R. at 268, 270, 273, 278-9, 280, 282, 309.

[61]R. at 280.

[62]R. at 268.

[63]R. at 267, 262-3.

complained of pain.[64]  By July, Ms. Surratt still required her hemi-cane to prevent falls, and her Berg balance score had gone from 45 to 21.[65]  A score of 21 indicated that Ms. Surratt was now at considerable risk of falling.  Because of Ms. Surratt's failure to improve, physical and occupational therapy were terminated in July, although Dr. Woods continued to prescribe tests.[66]

On July 9, 2007, Ms. Surratt returned to Stroger for more blood tests.[67]  She complained of episodic weakness, falls, and difficulties climbing the stairs to her second-floor apartment.[68]  She told hospital personnel she was still in pain.[69]  The additional blood testing still did not disclose the source of her ailments.

There are no medical records for the months of August or September 2007, but in October Ms. Surratt returned to ACHN for a checkup and to refill her extensive list of medications.[70]  Dr. Woods prescribed a number of medications, including pain medication and a multipurpose medication for depression.[71]  She also complained of chest pain and dizziness.[72]  ACHN notes indicate that Ms. Surratt was using a "walker."[73]

In December of 2007, tests finally began to disclose possible reasons for Ms. Surratt's symptoms.  A December 17, 2007, CT scan of her spine, while otherwise "unremarkable," showed

---

[64]R. at 259.

[65]*Id.*, R. at 268.

[66]R. at 253.

[67]R. at 330, 337.

[68]*Id.*

[69]*Id.*

[70]R. at 329.

[71]R. at 349-50.

[72]R. at 329.

[73]*Id.*

"[v]ery mild multilevel degenerative disc disease with small diffuse posterior disc bulges at multiple levels."[74]  The report notes that CT scanning is not the best way to evaluate soft tissue such as the spinal canal; if soft tissue analysis is needed, an MRI is the next step.[75]

An MRI was performed on February 8, 2008, and disclosed mild myelomalacia and disc bulges.[76]  Myelomalacia is a softening of the spinal cord which can result in numbness, sensory loss, and partial to complete paralysis.[77]  Ms. Surratt was scheduled for surgery (a discectomy) on April 4, 2008.[78]  At her preoperative consultation with Maninder Kohli, M.D., she was documented at a stable weight, with clear lungs, although the doctor noted her asthma, a goiter, and limited effort tolerance.[79]  Ms. Surratt never had the surgery; she was apparently concerned about finding care for her brother should she be hospitalized or fully immobilized.[80]

### b.    Disability Evaluations

During the same period of time during which Dr. Woods evaluated her, Ms. Surratt was also evaluated several times as part of her application for disability.  At each evaluation she made similar complaints and described her symptoms consistently.  She did not, however, bring medical records with her to the evaluation appointments, and the evaluating doctors were forced to mostly rely on her self-reports.

---

[74]R. at 348, 399.

[75]R. at 348.

[76]R. at 399-400.

[77]F.W.  Langdon, *Myelomalacia, With Especial Reference To Diagnosis and Treatment*, Journal of Nervous and Mental Disease. 32 (5): 233 (1994) .

[78]R. at 402.

[79]R. at 386, 412.

[80]R. at 428.

On May 22, 2006, Ms. Surratt was first evaluated as part of her disability application. Fauzia A. Rana, M.D., at Lakeshore Medical Clinic, first discussed Ms. Surratt's ongoing problems, and then performed her own objective testing. Ms. Surratt complained of asthma, but told Dr. Rana that she had not been hospitalized or received emergency breathing treatment "because she cannot afford it."[81] Ms. Surratt also told Dr. Rana that she could "hardly walk half a block because she feels off-balance and she uses a walker all the time."[82] Ms. Surratt reported that she had recently been told she had an enlarged heart, that she was taking high blood pressure medication, and that she had a history of locked bowels although laxatives "fixed the problem."[83] She further complained of pain in her knees, legs, and left shoulder, stating that she had "an extra bone in her shoulder which cuts off the circulation."[84] She told Dr. Rana that she had lost consciousness "because of this reason" in 1993, and had been on physical therapy for a while.[85] Dr. Rana recorded the pain as arthralgia, which is non-specific severe joint pain (in contrast to arthritis, which is joint pain with inflammation).[86]

When Dr. Rana examined Ms. Surratt, she noted that Ms. Surratt was "alert and oriented in time, place and person."[87] Dr. Rana did not observe any edema (swelling) in Ms. Surratt's extremities, and noted that her lungs were clear and her heart had a regular rhythm.[88] "She could

---

[81]R. at 207.

[82]*Id.*

[83]*Id.*

[84]*Id.*

[85]*Id.*

[86]Richard Sloane, *The Sloane-Dorland Annotated Medical-Legal Dictionary* 61, (West 1987).

[87]R. at 208.

[88]R. at 209.

get up from the chair, step up on the stool, and sit on the examining table by herself."[89] She could also button, turn knobs, and manipulate objects with both hands, and Dr. Rana rated her upper extremity muscle strength at 5/5.[90] Ms. Surratt refused to lie on the table or to stand without her walker during the exam.[91] She claimed that lying down "cuts the air in her chest" and that she "tends to become off balance and tends to fall down" without the walker.[92] Despite this, however, Dr. Rana's records show that Ms. Surratt "was observed after the exam, in the waiting room, folding up the walker and carrying out of the office." [sic][93]

Dr. Rana also perfomed a mental status evaluation, and opined that Ms. Surratt was anxious and possibly depressed.[94] Although her "ability to concentrate [was] fair" Dr. Rana questioned whether Ms. Surratt should handle her own funds.[95]

On June 19, 2006, Ms. Surratt was psychologically evaluated by Ana M. Gil, M.D., S.C., pursuant to her disability claim.[96] Dr. Gil found her to be a reliable informant with logical thought processes, and interviewed her about her illness and symptoms.[97] Ms. Surratt told Dr. Gil that she had never been treated for depression, although her mother had died recently and she had lost twelve relatives.[98] She discussed her living situation extensively, including the frustrations of caring for

---

[89] R. at 208.

[90] R. at 209.

[91] R. at 208.

[92] *Id.*

[93] R. at 209.

[94] *Id.*

[95] *Id.*

[96] R. at 213-16.

[97] R. at 213.

[98] R. at 213.

her brother, having insomnia and being physically unable to exercise or handle household chores.[99]

Ms. Surratt told Dr. Gil that her godmother and godsisters were her only social support, stating "[w]hen I was very sick with my congestive heart failure, they were the ones that helped me. They seemed to make things better for me. They came over and they checked on us and they helped me with my daily activities."[100]  On further questioning, Ms. Surratt told Dr. Gil that her brother now helped her with grooming, cooking, and laundry when she was unable to do these things herself.[101]

Based on this interview, Dr. Gil diagnosed dysthymic disorder and a moderately severe single episode of major depression.[102]  Dysthymic disorder is characterized by mild to moderate chronic depression and despondency.[103]  Unlike Dr. Rana, Dr. Gil found Ms. Surratt competent to handle funds.[104]

On July 18, 2006, Carl Hermsmeyer, Ph.D, a medical consultant for the State, performed a mental RFC assessment on Ms. Surratt.[105]  Dr. Hermsmeyer found Ms. Surratt to be moderately limited in carrying out instructions, and noted that she had dysthymic disorder and depression at a "more than non-severe" level, although her symptoms "do not meet or equal a medical listing."[106]

---

[99]R. at 214-15.

[100]R. at 214.

[101]R. at 215.

[102]R. at 216.

[103]*Merck Manual of Diagnosis and Therapy* 1538-39 (Mark H. Beers and Robert Berkow, eds., Merck & Co. 1999).

[104]R. at 216.

[105]R. at 219.

[106]*Id.*

Dr. Hermsmeyer found Ms. Surratt capable of carrying out "simple one- and two-step tasks at a consistent pace.[107]

During the remainder of 2006 and the first half of 2007, there was apparently no additional medical evaluations specifically related to Ms. Surratt's disability application. There is no evidence in the record showing what led to this decision, although during this period Ms. Surratt was in physical therapy attempting to remedy or at least alleviate her symptoms. Regardless of the reason, however, Ms. Surratt was next evaluated by doctors for the State over a year later.

On July 10, 2007, Ms. Surratt was interviewed by Myrlie Larena Casco, M.D. on behalf of the Bureau of Disability Determination Services.[108] Dr. Casco noted that Ms. Surratt complained of intermittent pain, stated she would become off-balance and fall without her walker, and had reduced flexion in her knees.[109] Ms. Surratt told Dr. Casco she was only capable of walking one block or climbing 5-7 stairs before she had to rest.[110] Dr. Casco was unable to test Ms. Surratt's lower body strength, because "sensory, poor cooperation and she wasn't able to do."[111] It is unclear whether Dr. Casco meant that Ms. Surratt was unwilling to let go of her walker for testing or that Ms. Surratt was unable to walk without it.

### B. The May 12, 2008, Hearing

Ms. Surratt's hearing before the Social Security Administration occurred on May 12, 2008, in Chicago, Illinois. She appeared in person and was represented by her attorney, Julie Monberg.

---

[107]R. at 221.

[108]R. at 245.

[109]R. at 246-47.

[110]R. at 245.

[111]R. at 247.

Also testifying were Sheldon Slodki, M.D., the medical expert ("ME") and Frank Mendrick, the vocational expert ("VE"). The ALJ began by asking Ms. Monberg if she had objections to the exhibits or the qualifications of the experts, then proceeded to question Ms. Surratt. Ms. Surratt established that she had not taken her pain medication that day because it made her incoherent and she was caring for her brother, who had accompanied her to court.[112]

### 1. Ms. Surratt's Testimony

Ms. Surratt's attorney opened by stating that based on the combination of Ms. Surratt's ailments, including asthma, dizziness, dysthymia, shoulder pain, chronic headaches, and cervical "spinal cord malacia [sic]," in addition to the Social Security Administration's review disclosing moderate impairments in social functioning and difficulty maintaining concentration, persistence and pace, Ms. Surratt would be unable to complete and maintain employment.[113]

The ALJ pointed out that the review disclosed Ms. Surratt was able to perform simple work.[114] Ms. Surratt's attorney replied that when considered in combination with the medical records obtained from Ms. Surratt's treating physician, Dr. Woods, the review contributed to the overall record showing that Ms. Surratt was unemployable.[115] The ALJ and Ms. Surratt's attorney discussed Dr. Woods' recommendation that Ms. Surratt have a discectomy, which Ms. Surratt said she had not had because of the difficulty of finding a caregiver for her brother.[116]

---

[112]R. at 422.

[113]R. at 423-24.

[114]R. at 424.

[115]*Id.*

[116]*Id.*

The ALJ proceeded to question Ms. Surratt, who established that she had a Bachelor of Arts degree and had worked as a teacher for eight months.[117]  After the school where she was working closed, Ms. Surratt was unable to find employment that would allow her to bring her brother with her to work.[118]  Ms. Surratt testified that she has tried unsuccessfully to place her brother in an assisted living facility.[119]  Ms. Surratt admitted that she had not been looking for work, citing difficulty in dressing and grooming in addition to needing to find care for her brother.[120]  She described her home life and daily chores as difficult, saying that she directs her brother in food preparation, and he assists her with bathing and grooming.[121]  Ms. Surratt brought a collapsible stool with her as well as her walker, but when the ALJ asked if she was considering a wheelchair, Ms. Surratt said she hoped not to need one, because she lived on the second floor and had to use stairs to get to her apartment.[122]  Under questioning by the ALJ and her attorney, Ms. Surratt claimed her major challenges are mobility, dizziness, headaches and pain, as well as unpredictable falling spells.[123]

The ALJ and Ms. Surratt also discussed Ms. Surratt's medical history.  Ms. Surratt described her symptoms as chest pains, left side paralysis, and her left side "going out" and noted that her weight had increased.[124]  Ms. Surratt had gone to the emergency room for her chest pains, but was

---

[117]R. at 425.

[118]R. at 426.

[119]*Id.*

[120]R. at 429-430.

[121]R. at 433.

[122]R. at 434.

[123]R. at 437.

[124]R. at 429-31.

unable to stay because she had to care for her brother.[125]  She had not gone in for the episodic paralysis.[126]

The ALJ next established that Ms. Surratt had used a walker since 2005, although her current ambulatory device had not been prescribed by her physical therapist until 2006.[127]  A significant amount of confusion followed concerning exactly what type of ambulatory device Ms. Surratt had been issued.  The ALJ asked whether Ms. Surratt would be able to walk with a cane, and Ms. Surratt said she had not tried using a cane.[128]  The ME noted that "[i]t says in the record that you were using a four-point cane," but he did not state where in the record that was indicated.[129]  Ms. Surratt testified that the device she brought with her "is what they're talking about.  This is the walker.  This is what I've had."  The ME clarified that Ms. Surratt had "never been issued a four-point cane," and she replied "No.  This is it."  Ms. Surratt then asked the ME what "you all call this?  Do you all call this a walker, or do you call this a cane?" and the ME replied "[t]hat's a walker."[130]

The ALJ went on to question Ms. Surratt about her May 22, 2006, evaluation visit with Dr. Rana, noting particularly that although Ms. Surratt had refused to ambulate without a walker during her evaluation, she had folded her walker to navigate the clinic doorway.[131]  Ms. Surratt explained that she had not yet been issued her hemi-walker, and the one she was using did not fit through the

---

[125]R. at 432.

[126]Id.

[127]R. at 427.

[128]R. at 445.

[129]Id.

[130]Id.

[131]R. at 443-44.

doorway.[132]  She further explained that she had not let go of her walker during the evaluation because when she tried to, she almost fell.[133]

Ms Surratt explained that when her balance first started to fail, she walked with her brother's help, then began using her grandmother's walker, which was "an encase. It's one that normally the [sic] measure you to say that that's a good fit."[134]  She claimed that she had told Dr. Rana that she used the walker for balance, and that "when he removed my walker from me, I almost fell.  My balance went off."[135]  The ALJ confirmed that Ms. Surratt "used it for balance... rather than as a walker."[136]

### 2.  The ME's Testimony

The ALJ proceeded to question the ME, who discussed a discrepancy between Ms. Surratt's testimony about weight fluctuation and the relative stability of her weight as indicated in the medical records, as well as noting that Ms. Surratt and Dr. Wood gave different "start" dates when asked about the length of their treating relationship.[137]  The ME went on to discuss Ms. Surratt's MRI results, and further hypothesized that a cervical rib (a supernumerary rib arising from the seventh cervical vertebra and located above the normal "first" rib) could be consistent with Ms. Surratt's

---

[132]R. at 444.

[133]*Id.*

[134]*Id.*

[135]*Id.*

[136]R. at 444-45.

[137]R. at 446.

symptoms.[138]  The ME based his discussion of the cervical rib on Ms. Surratt's self-report of an "extra rib" in her application for disability.[139]

He noted the episodic nature of her complaints, but also suggested that if the complaints were disregarded and just "the objective evidence" counted, he did not believe Ms. Surratt's condition equaled a disability, although he described her as "crippled."[140]  He went on to note, however, that the record as a whole documented episodic balance problems which would "marked [sic] limit her in the workplace" and that the periodic weakness, combined with ambulatory aids, "would put her in less than sedentary."[141]  The ME stated that the anterior discectomy suggested by Ms. Surratt's treating physician would be an appropriate next step.[142]  Finally, the ME noted that objective neurological evidence of Ms. Surratt's stability problems was documented as of March 2006.[143]

### 3.    The VE's Testimony

The ALJ went on to question the VE, first asking him to conform his testimony to the Dictionary of Occupational Titles ("DOT") or indicate if he deviated from the DOT.[144]  The VE questioned Ms. Surratt and determined that she did not have her teaching certificate, although she was working on her master's degree and a teaching certificate at the time her condition became

---

[138]R. at 447.

[139]*Id.*

[140]R. at 448.

[141]R. at 450-51.

[142]R. at 451.

[143]R. at 452.

[144]R. at 453.

severe.[145]  Based on Ms. Surratt's answer, the VE then described Ms. Surratt's prior employment as a teacher as light, semi-skilled work, with no transferable skills because she was uncertified.[146]

The ALJ suggested limitations of "sedentary work, needs a cane, simple work," and the VE responded that 2,000 general assembly jobs, 1,200 simple inspection jobs, and 2,000 bench hand packing jobs were listed with those specifications in the six-county Chicago area.[147]  Next, the ALJ and Ms. Surratt's attorney refined the VE's testimony with hypotheticals based on their perceptions of Ms. Surratt's limitations.

On questioning by the ALJ, the VE noted that use of a wheelchair or walker in the workplace would be considered a concession, making the person unemployable; a cane would not be a concession.[148]  Under questioning by Ms. Surratt's attorney, the VE explained that if a worker could not maintain attention for at least 80% of the work day they would be unemployable.[149]  In an answer to a hypothetical from the ALJ, the VE responded that an RFC which limited co-worker interaction would make no difference in his original answer.[150]

### C.    The ALJ's June 27, 2008, Decision

In her June 27, 2008, decision, the ALJ ruled that Ms. Surratt was not disabled and therefore not entitled to DIB.[151]  The ALJ followed the five-step process outlined in 20 C.F.R. 416.920(a). First, the ALJ found that Ms. Surratt had not engaged in substantial gainful activity since March 21,

---

[145]R. at 452.

[146]R. at 453.

[147]R. at 454-55.

[148]R. at 454.

[149]R. at 457.

[150]R. at 457.

[151]R. at 15.

2006 (the date of application for benefits).[152] Second, the ALJ found severe impairments causing more than minimal functional limitations: affective mood disorder, C4-C5 myelomalacia, hypertension, asthma, and obesity.[153]

At the third step of the sequential process, the ALJ found that Ms. Surratt did not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. 404 Subpart P Appendix 1. Specifically, she found evidence that joint pain did not result in an impairment satisfying Listing 1.02, and that dexterity was unimpaired.[154] The ALJ discounted the credibility of evidence pointing to Ms. Surratt's need for a walker, and decided that Ms. Surratt needed only a cane.[155] The ALJ discussed the MRI findings, and concurred with Dr. Slodki's opinion given at the hearing that any neurological impairments documented did not meet or equal a Listing.[156]

In reviewing Ms. Surratt's mental impairments, the ALJ found mild restrictions in daily living activities and social functioning.[157] The ALJ cited Ms. Surratt's interactions with physicians and examiners, her ability to care for her brother, and her 1998-99 teaching job as examples of social functioning.[158] The ALJ found moderate impairment as to concentration, persistence, and pace, noting that "[h]er concentration is more than mildly, but not markedly, impaired."[159] Owing to the

---

[152]R. at 17.

[153]Id.

[154]Id.

[155]Id.

[156]Id.

[157]R. at 18.

[158]Id.

[159]Id.

lack of "marked" limitations, Ms. Surratt was found not to meet the Paragraph B requirements for mental impairment.[160] The ALJ further noted that there was not a medically documented history of a chronic affective disorder of two years' duration, and that Ms. Surratt was not receiving medications for any mental impairment; therefore, Ms. Surratt did not meet the requirements of Paragraph C.[161]

In making her mental evaluation, the ALJ disagreed with the state agency psychiatrists, including the medical consultant, Dr. Hermsmeyer, who found that Ms. Surratt had moderate limits in social functioning.[162] The ALJ also found that, contrary to the opinion of the examining psychiatrists, Ms. Surratt's capacity was not limited to one- and two-step simple tasks, because the record documented her ability to care for her mentally handicapped brother and that activity was not consistent with those limitations.[163]

The ALJ next determined Ms. Surratt's residual functional capacity ("RFC"), which indicates the type of work she is capable of performing in spite of her limitations. The ALJ followed a two-step process in making her determination: first, she determined that the overall medical record, including the MRI findings and positive Romberg test, combined with her depression and anxiety, showed objective support for a finding that a medically determinable impairment could reasonably be expected to produce Ms. Surratt's symptoms.[164] Second, she evaluated the intensity, persistence, and limiting effects of the symptoms, basing her evaluation on the entire record and her

---

[160]R. at 18.

[161]*Id.*

[162]R. at 25.

[163]*Id.*

[164]R. at 22.

determination of Ms. Surratt's credibility.[165]  The ALJ found that the objective evidence in the record did not support the limitations alleged by Ms. Surratt, and found Ms. Surratt less than fully credible.[166]

The ALJ noted that other than the MRI and positive Romberg test, there was little objective evidence in the record to support Ms. Surratt's claims.[167]  Despite claims of shortness of breath and an enlarged heart, cardiopulmonary findings were within normal limits.[168]  The ALJ commented on the limited history of edema complaints in Ms. Surratt's medical records.[169]  There is no documentation of atrophy or lower body weakness, which the ALJ said would support Ms. Surratt's claims of paralysis and need for ambulatory aids, and Ms. Surratt has been observed walking without the aids.[170]  The record also did not reflect complaints of incoherency owing to medication, although Ms. Surratt included those in her application and reported at the hearing that she had not taken her medication because it made her incoherent.[171]  The ALJ also noted that "the evidence of record does not establish that she is receiving...medications for any mental impairment."[172]

The ALJ also found Ms. Surratt's reasons for refusing surgery less than credible, noting that "it is difficult to see how her ability to care for her brother could deteriorate further" and suggesting that because "her Godmother and God sisters were helpful to her" in assisting with daily tasks once,

---

[165]Id.

[166]Id.

[167]Id.

[168]R. at 23.

[169]Id.

[170]Id.

[171]Id.

[172]R. at 18.

Ms. Surratt should call on them to care for her brother during her hospitalization.[173] Finally, the ALJ noted inconsistencies in Ms. Surratt's self-report of her work record and suggested that her presentation at the hearing was "rather dramatic and not credible" because "if she needs a collapsible stool to supplement her walker, a wheel chair would be prescribed."[174]

The ALJ next evaluated the medical testimony and medical records, giving weight to each based upon her credibility determinations. Despite finding Ms. Surratt less than fully credible, the ALJ gave some weight to the ME's testimony at the hearing that if Ms. Surratt were fully credible, she would not be capable of even sedentary work.[175] Because of the objectively supported balance problems, she gave less than significant weight to a non-examining physician's opinion that Ms. Surratt is capable of a reduced range of medium work.[176] Finally, the ALJ gave little weight to Dr. Woods' opinion that Ms. Surratt was capable of less than the full range of sedentary work, because she found that Dr. Woods' diagnosis was influenced by Ms. Surratt's subjective complaints and not fully supported by objective evidence of record.[177]

Based upon the entire record, the ALJ found that Ms. Surratt had the RFC to perform sedentary work with the following limitations: lift, carry push and pull 10 pounds; stand and walk for two hours; sit six hours; and perform simple unskilled work.[178] The ALJ further noted that

---

[173]R. at 24.

[174]*Id.*

[175]*Id*; R. at 451.

[176]R. at 24.

[177]R. at 25.

[178]R. at 19.

Ms. Surratt should be allowed a sit/stand option and permitted to use a cane.[179] The "cane" was specifically distinguished from the "walker" that Ms. Surratt brought to the hearing.

After noting that Ms. Surratt was unable to resume her past relevant work as a teacher, the ALJ determined that employment consistent with Ms. Surratt's RFC was available in significant numbers in the national economy.[180] The ALJ based this determination on the VE's testimony at the hearing.[181] After asserting that the VE's testimony was consistent with the DOT, the ALJ concluded that Ms. Surratt had not been disabled since March 21, 2006.[182]

## STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but factual determinations are entitled to deference.[183] "As long as the ALJ's decision is supported by substantial and convincing evidence, it deserves... deference."[184] The ALJ's decision regarding a claimant's credibility will not be overturned unless it is clearly incorrect.[185] However, an ALJ must "articulate in a reasonable manner the reasons for his assessment of a claimant's residual functional capacity, and in reviewing that determination a court must confine itself to the reasons supplied by the ALJ."[186]

---

[179]*Id.*

[180]R. at 26.

[181]*Id.*

[182]*Id.*

[183]*Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

[184]*Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citing *Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006)).

[185]*Id.*

[186]*Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009).

## SOCIAL SECURITY REGULATIONS

The Social Security Regulations outline a sequential five-part test for determining whether or not a claimant is disabled. The ALJ must consider: first, whether the claimant is presently engaged in substantial gainful activity; second, whether the claimant has a severe impairment or combination of impairments; third, whether the claimant's impairments meet or equal an impairment listed in the regulations for being severe enough to preclude gainful activity; fourth, whether the claimant is unable to perform her past relevant work; and finally, whether the claimant is unable to perform any other work that exists in significant numbers in the national economy.[187] A finding of disability requires an affirmative answer at either the third or the fifth step, while a negative answer at any step other than three precludes a finding of disability.[188]

## ANALYSIS

In her motion for summary judgment, Ms. Surratt assigns four errors to the ALJ: (1) the ALJ impermissibly played doctor by substituting her lay opinions for those of medical professionals in formulating Ms. Surratt's RFC; (2) the ALJ's inferences in finding Ms. Surratt less than credible were improper because Ms. Surratt's testimony was supported by, not inconsistent with, the record; (3) the ALJ mischaracterized the testimony of medical expert Dr. Slodki by saying that Dr. Slodki only found Ms. Surratt to be disabled if Ms. Surratt were fully credible; and (4) the ALJ failed to adhere to Social Security Ruling 00-4p at the hearing by not asking the VE whether his testimony was consistent with the DOT.

---

[187]*See* 20 C.F.R. § § 404.1520, 416.920.

[188]*Id.*

The Commissioner has responded that because the inconsistencies in Ms. Surratt's claims undermined her credibility, the ALJ is entitled not only to reject Ms. Surratt's claims but any medical opinions that the ALJ believes are based on those claims. The Commissioner defends the ALJ's determinations concerning Ms. Surratt's walker by reiterating the ALJ's conclusions that records concerning her prescribed ambulatory device were inconsistent with her testimony. The Commissioner also defends the ALJ's mental RFC formulation by stating that Ms. Surratt's ability to care for her brother shows that she is able to perform more than simple one- and two-step tasks. Finally, the Commissioner points out that when the ALJ started questioning the VE, she did ask him to specifically note any deviations from the DOT in his testimony.

## I. "Playing Doctor"

Ms. Surratt claims that the ALJ substituted her own lay judgment for that of medical professionals in two respects: first, by substituting a cane for a walker; and second, by rejecting medical evidence of record when determining Ms. Surratt's mental capacity. Before the ALJ formulates an RFC, the claimant's limitations must be assessed, both mental and physical.[189] In determining these limitations, the ALJ relies on the record and the claimant's testimony at the hearing.[190] The ALJ's determination of limitations may depend in part on whether evidence in the medical records contradicts (or is contradicted by) the claimant's testimony.[191] The ALJ's assessment of the claimant's credibility may determine how much weight is given to each piece of evidence; however, the ALJ may only balance the evidence, not discard it and formulate a new

---

[189]20 C.F.R. § § 404.1520, 416.920.

[190]*Id.*

[191]*Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

medical opinion.[192]   Absent any record support, ALJs may not substitute their judgment of what a condition requires for that of a treating medical professional.[193]   In fact, the opinion of a treating physician is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.[194]   If an ALJ makes independent medical findings rather than relying on findings in the record, he is said to have "succumbed to the temptation to play doctor" and committed a reversible error.[195]

A.    The Walker

The ALJ found that Ms. Surratt's claim to need a walker for ambulation was neither credible nor supported by medical evidence.   At the hearing, both the ALJ and the ME stated that medical records showed that the device that Ms. Surratt was issued was a "cane."[196]   Both the ALJ and the ME, however, described the device that Ms. Surratt brought with her to the hearing as a "walker."[197] Ms. Surratt also brought a collapsible stool to the hearing.[198]   The ALJ, therefore, looked for evidence in the record to support Ms. Surratt's claim to need a walker and a collapsible stool. Instead of finding what she would have deemed supportive evidence, however, she noted that Ms. Surratt's claims of paralysis were undocumented in the record, that Ms. Surratt did not show reduced motor strength in her lower extremities, that she had at least once used her walker "in a loose fashion," and that she had once folded her walker to navigate a doorway during an evaluative

---

[192]*Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

[193]*Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

[194]*Id*; 20 C.F.R. 404.1527(d)(2).

[195]*Clifford*, 227 F.3d at 870.

[196]R. at 445.

[197]*Id*.

[198]R. at 433.

consultation.[199] Based on this evidence, the ALJ found that Ms. Surratt was not credible in her claim to need the walker, and also stated that had she in fact needed a collapsible stool, "a wheelchair would be prescribed."[200] Still, throughout the ALJ's questioning about the descriptions of her assistive device in the record, Ms. Surratt said "I haven't tried a cane.." and then referred to the device she had brought to the hearing, stating "[t]his is what they're talking about... [t]his is what I've had."[201] (It should be noted that the incident when Ms. Surratt folded her walker to pass through the doorway took place before she was issued her own device, while she was borrowing her grandmother's walker.)[202]

To understand the apparent confusion during Ms. Surratt's hearing, it is important to clarify what device Ms. Surratt was actually prescribed - a hemi-cane - and to understand the difference between a "cane" and a "hemi-cane" (also known as a "hemi-walker"). The record shows that Ms. Surratt was issued a hemi-cane by her physical therapist, and the same device was later described in notes by other medical personnel.[203] This foldable four-point cane closely resembles a walker, but is designed for use with one hand and weighs much less than a standard walker.[204] It is appropriate for use in situations where a true "cane" does not provide adequate support, or where an individual has inadequate balance to use an ordinary four-point cane (which has a single stem but splits near the ground to form four "feet").[205] Because the ME referred to the hemi-cane as a

---

[199]R. at 23.

[200]R. at 23.

[201]R. at 445.

[202]R. at 207, 318.

[203]R. at 262, 268, 280, 329.

[204]Tideiksaar, *Falls in Older People: Prevention and Management* at 71.

[205]*Id.*

"walker" at the hearing, we will refer to it interchangeably as a walker or hemi-cane.[206]  It is apparent from the record, however, that regardless of minor variations in description, it is the same device prescribed and carried throughout Ms. Surratt's treatment history.[207]

Much of the ALJ's confusion appears to concern the reasons why a walker was, perhaps, prescribed.  The ALJ's focus was on evidence of muscular weakness or paralysis, and she combed the record for evidence to support claims of a lower extremity weakness.  She looked for paralysis, atrophy, and reduced limb strength, did not find evidence to show any of those limitations, and then determined that the walker was unnecessary.[208] Ms. Surratt, however, did not claim to need a walker to compensate for reduced strength in her lower limbs.  Rather, she repeatedly claimed balance problems, dizziness, and falls.  As the ALJ herself noted at the hearing, the walker was not a support device but a balance aid.[209]  Ms. Surratt stated that she could also wall-walk to keep her balance, as she did to navigate the doorway in Dr. Rana's office.[210]  Ms. Surratt's testimony and the evidence of record were consistent with using the walker to balance.

While the ALJ is correct that Ms. Surratt complained of "paralysis," she did not complain of lasting or persistent paralysis.  Rather, she complained of intermittent, unpredictable paralytic episodes which caused her left side to collapse beneath her.[211]  Keeping this complaint in mind, it is difficult to support the ALJ's position that "[episodes of paralysis] have not been documented in

---

[206]R. at 445.

[207]R. at 262, 268, 280, 329.

[208]R. at 23.

[209]R. at 444-45.

[210]R. at 207.

[211]R. at 430.

the record," because physical therapy notes repeatedly show that Ms. Surratt complained of falls.[212] She even had a near-fall in therapy, while under observation.[213] Her Berg balance score was 21, making her a high fall risk.[214] She was issued, and was still using at the time of the hearing, a hemi-cane to prevent falls.[215] Not only is there "some" documentation of episodic collapse, it is everywhere in the record.

When the ALJ substituted an ordinary cane for a hemi-cane in the RFC, she fundamentally changed the nature of the prescribed treatment. Ms. Surratt was using the ambulation aid prescribed by her physical therapist.[216] The ALJ decided that Ms. Surratt had actually been prescribed a cane, in the face of testimony from Ms. Surratt that she had been prescribed the device that she brought to the hearing (and despite evidence of record indicating what device Ms. Surratt was using).[217] As stated previously, nowhere in the record is there reference to a true cane, only the hemi-cane or hemi-walker that Ms. Surratt brought to the hearing. Because the ALJ may not substitute her own opinion for that of the medical experts, the RFC based on a cane rather than a walker is not consistent with the medical evidence of record.[218]

Finally, regarding the VE's testimony at the hearing, the failure to include Ms. Surratt's walker in the RFC may have been determinative of whether Ms. Surratt was employable. This is because the VE's testimony depended on the RFC, and the RFC was formulated with the limitation

---

[212]R. at 23, 267-68, 280, 306-08, 314-16.

[213]R. at 280.

[214]R. at 268.

[215]R. at 262, 268, 280, 318, 327, 329.

[216]R. at 318.

[217]R. at 443-45.

[218]*Clifford*, 227 F.3d at 870.

"needs a cane," not "needs a walker." In fact, the VE testified that requiring a walker would be an employer accommodation making Ms. Surratt unemployable for purposes of an SSI determination.[219] This means that, all other possible error aside, the ultimate determination of whether Ms. Surratt is disabled may depend on whether she carries an ordinary cane or the hemi-cane prescribed by her caregivers. Because it is impossible to tell whether changing the RFC would have changed the ultimate determination of Ms. Surratt's disability, this case must be remanded for a new determination, based on a new RFC that includes allowing Ms. Surratt to use her prescribed device.

### B.     The Mental Capacity Assessment

Ms. Surratt assigns error to the ALJ's mental capacity determination and mental RFC because the ALJ found Ms. Surratt to be only "mildly" limited in mental functioning, in contrast to the medical consultant Dr. Hermsmeyer's determination that she faces moderate limits in that regard.[220] The ALJ's decision need not be perfect or unassailable; it must merely be supported by evidence in the record sufficient for a reasonable person to reach the same conclusion as the ALJ.[221] Furthermore, while the ALJ may give greater or lesser weight to an examining physician's opinion, she may not substitute her own judgment for his in making a determination, without relying on other medical evidence in the record.[222] In formulating a mental capacity assessment, the ALJ must account for variations in concentration, persistence, and pace.[223] Impairment in concentration, or

---

[219]R. at 454.

[220]R. at 25.

[221]*Rice v. Barnhart*, 384 F.23d 363, 369 (7th Cir. 2004).

[222]*Clifford*, 227 F.3d at 870.

[223]*Stewart v. Astrue*, 362 F.3d 679, 684 (7th Cir. 2009).

variations in persistence or pace, can limit a claimant's ability to work even if during unimpaired times the claimant is capable of sustaining a job.[224]

There are two aspects to the ALJ's mental capacity determination for Ms. Surratt: social functioning and capacity to remember and perform tasks at a consistent pace. The ALJ based her determination of Ms. Surratt's mental capacity and ability to interact with others on her demeanor at the hearing and on evidence in the record, which is confined to the reports of evaluating doctors and Ms. Surratt's self-report of a job she held in 1998-99. The time period under examination begins March 21, 2006.[225] Evidence of Ms. Surratt's mental capacity and interactions with others eight years before the period under examination does not seem relevant to this inquiry, where there is significant other evidence in the record dealing specifically with the period in question. However, as the ALJ noted, there is ample other evidence in the record of Ms. Surratt's ability to function socially and interact appropriately with others, including her medical treatment providers.[226]

While it is true that the ALJ does not discuss variations in persistence and pace in her opinion, the record is also silent on pace variations. Dr. Hermsmeyer's opinion, upon which Ms. Surratt depends heavily for support in her assignment of error, states that Ms. Surratt is able to "perform simple one and two-step tasks at a consistent pace."[227] The ALJ also based her determination in part on the lack of complaints of incoherency owing to medication in the record, although Ms. Surratt did mention incoherency in her application and reported at the hearing that she

---

[224]*Craft v. Astrue*, 539 F.3d 668, 676-77 (7th Cir. 2008).

[225]R. at 17.

[226]R. at 18.

[227]R. at 221.

had not taken her medication because of incoherency.[228]  Incoherency is indeed undocumented in the medical records, although it is claimed in the application for disability and in Ms. Surratt's testimony at her hearing.  Because the ALJ's mental capacity determination is supported by evidence in the record, however, there is no basis upon which to disturb this portion of the ALJ's decision.  The ALJ was well within her discretion to base her mental capacity assessment on the medical evidence in the record and use her credibility assessment to justify giving less weight to Ms. Surratt's application and testimony.[229]

## II.    The Credibility Determination

The ALJ's credibility determination is used to help determine how much weight to give medical evidence and a claimant's testimony.  Therefore, it is an important part of the ALJ's decision-making process, even if it is not overtly part of the RFC.  Ms Surratt claims that the ALJ's determination of her credibility is based on improper inferences; that is, unless an improper inference is made from record evidence, her testimony is consistent with that record.  The Commissioner has responded with a list of the purported inconsistencies which the ALJ found between Ms. Surratt's claims and the objective evidence of record, including claims of edema, weight gain, medical impairments such as asthma or congestive heart failure, ability to ambulate independently, claims of pain and incoherence, refusal to have surgery, reasons for leaving employment, and claims of depression.  The Commissioner further suggests that Ms. Surratt's credibility was undermined by the lack of objective medical test results supporting her claims.

---

[228]R. at 23.

[229]*Rice*, 384 F.23d at 369.

An ALJ's credibility determination will not be disturbed unless it is patently wrong.[230] The policy reasons for this are manifold; foremost, of course, is that the ALJ is actually in the room with the claimant, observing her demeanor.[231] A reviewing court is necessarily in an inferior position to second-guess the ALJ's determination.[232] However, when the credibility determination is based not on the claimant's demeanor but upon evidence in the record, the reviewing court may step in when the determination is actively contradicted by evidence presented in the record.[233]

Because the ALJ based her credibility determination on a series of purported discrepancies between Ms. Surratt's testimony and the record, those discrepancies must each be reviewed to determine if they are, in fact, contradictory. In doing so, this Court notes that while the ALJ must only have some reasonable support for each conclusion, she may not "cherry-pick" evidence of record, ignoring that which does not support her conclusion.[234]

## A. Edema

The ALJ stated in her opinion that "documentation and complaints of edema are generally not prevalent in the claimant's medical records."[235] To the contrary, edema is consistently present in the medical record. Caregivers have observed edema on several occasions over the period covered by the records.[236] This is objective evidence in the record which supports Ms. Surratt's claim and contradicts the ALJ's findings.

---

[230]*Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir.1994).

[231]*Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

[232]*Id.*

[233]*Clifford*, 227 F.3d at 872.

[234]*Id.* at 871.

[235]R. at 23.

[236]R. at 346, 319, 337.

### B. Weight Gain

The ALJ has significant support for her position that Ms. Surratt's self-reports of weight gain are contradicted by the record and undermine her credibility. As both the ALJ and ME noted, although Ms. Surratt reported weight gain of as much as 100 pounds, the weight documented in the records is stable to within 10-15 pounds, or approximately 3% of Ms. Surratt's weight.[237] The inconsistencies between the objective evidence and Ms. Surratt's report reasonably support an inference that Ms. Surratt is less than credible.

### C. Asthma

The ALJ found that the pulmonary study results undermined Ms. Surratt's complaints of asthma. She also noted that there are no records of hospitalization for asthma. However, this does not support a finding that there is no asthma. Asthma is repeatedly documented in the medical records and Ms. Surratt has been prescribed asthma medication.[238] The record supports, rather than undermines, complaints of asthma, although it may undermine complaints of *severe* (and therefore disabling) asthma.

### D. Congestive Heart Failure

The ALJ noted that although Ms. Surratt claimed congestive heart failure, it was not documented elsewhere in the record. "Chest pain" is documented in several places, but there are no specific records relating to hospitalization or treatment for heart failure, and in her testimony at the hearing Ms. Surratt described her chest pains as pain during breathing.[239] Ms. Surratt's claim is not actively contradicted by the record, but it is more than merely unsupported; that is, in a record

---

[237]R at 374; R. at 207, 245, 333, 335.

[238]R. at 245, 349, 386.

[239]R. at 436.

containing supposedly comprehensive medical information, the absence of information about a serious condition is suggestive.[240]

### E. Ability to ambulate

As previously discussed, the ALJ found a discrepancy between Ms. Surratt's claims about her ability to ambulate and the "objective evidence" of record. Although only the MRI and the positive Romberg test show objective evidence that would support Ms. Surratt's allegations of physical limitations, they are also the only tests performed that would be expected to show those limitations. A specialist looking at one area of the body is not looking at, nor may he be competent to diagnose, another area.[241] Therefore, courts should be hesitant to use a lack of findings in one medical report to undermine a discrete medical condition.[242]

Ms. Surratt's claimed limitations are, as the ALJ found, consistent with myelomalacia, a disease of the soft neural tissues of the spine.[243] A lack of findings in tests that do not specifically investigate soft neural tissue, therefore, does not contradict or undermine the findings in the tests that disclosed neural tissue damage. Blood testing and CT scans are not expected to show soft tissue damage. Therefore, the silence of the other medical tests should not be used to undermine the positive results from the spinal MRI - the only test that looked for, and found, soft neural tissue damage.

---

[240]*Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005).

[241]*Wilder v. Chater*, 64 F.3d 335, 337 (1995) (citing *Spellman v. Shalala*, 1 F.3d 357, 363 (5th Cir. 1993)); *Rivera v. Sullivan*, 923 F.2d 964, 969 (2d Cir. 1991).

[242]*Id.*

[243]R. at 22.

### F. Complaints of pain and incoherency

The ALJ found that Ms. Surratt's complaints of pain and incoherency were not supported by the record because in one instance she denied pain, and she did not complain of incoherency to medical professionals.

Denial of pain on one day by a person with a fluctuating condition does not entirely undermine a claim of pain, as the Commissioner suggests; instead, the ALJ must consider complaints of pain if supported by medical signs or findings.[244] An ALJ may not entirely discount a claimant's subjective allegations.[245] Where the allegations are not fully supported by the medical record, the ALJ must follow 20 C.F.R. 404.1529, which requires a two-step analysis. First, the ALJ must consider whether there are medical signs and laboratory findings which show that the claimant has a medical condition which could reasonably be expected to produce the symptoms alleged; next, the ALJ must determine to what extent the claimant's alleged functional limitations and restrictions can reasonably be accepted as consistent with the medical signs.[246]

Where allegations of limitations are not fully supported by objective medical evidence, the ALJ must obtain detailed descriptions of the claimant's daily activities of living, and direct specific questions to the claimant.[247] If the claimant's testimony tends to undermine or contradict her allegations, this undermines the weight of the testimony, but minimal daily living activities do not establish that a person is capable of engaging in substantial physical activity.[248] Factors that must

---

[244]*Clifford*, 227 F.3d at 871 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)); 20 C.F.R. 404.1529.

[245]*Clifford*, 227 F.3d at 871.

[246]20 C.F.R. 404.1529(a).

[247]*Clifford*, 227 F.3d at 871.

[248]*Id.* at 872.

be considered when determining whether a record documents pain are the nature and intensity of the pain, aggravating factors, dosage and effectiveness of pain medications, other treatment for pain relief, functional restrictions, and daily living activities.[249]

The ALJ's decision indicates that she followed this two-step process in making her determination: first, she determined that the medical record, including the MRI findings and positive Romberg test, showed that a medical condition could reasonably be expected to produce Ms. Surratt's symptoms.[250] Second, she evaluated the intensity, persistence, and limiting effects of the symptoms, based on the entire record and her determination of Ms. Surratt's credibility.[251] Because she found Ms. Surratt less than fully credible, the ALJ chose to discount what she considered the "subjective portions" of the record in making her RFC.[252] This determination, however, was made in part based on supposed contradictions between the record and Ms. Surratt's testimony and claimed limitations. To the extent the record does not actually contradict the claimed limitations, the ALJ's decision cannot be said to be supported by substantial evidence.[253]

The ALJ found that Ms. Surratt's claimed limitations were contradicted by the record in several aspects. First, she found that of all objective testing done, only the MRI and a positive Romberg test showed significant abnormalities.[254] Then she found that the record did not objectively document pain, and that Ms. Surratt was able to adequately care for her brother. She found that this lack of documentation and capacity to perform tasks undermined Ms. Surratt's credibility.

---

[249]*Id.*

[250]R. at 22.

[251]R. at 22.

[252]R. at 22.

[253]*Clifford*, 227 F.3d at 872.

[254]R. at 22-23.

The record does, however, document objective evidence of pain. Only once does Ms. Surratt "deny pain" to her doctor; at nearly every other contact with medical personnel she complains of pain.[255] Pain medication has been prescribed for Ms. Surratt by her treating physician throughout the time period in question.[256] There is ample evidence of pain in the record to support Ms. Surratt's claims, and the ALJ must consider all, not merely some, of the evidence in the record.[257]

The ALJ found that Ms. Surratt's ability to care for her mentally handicapped brother and perform light household work showed fitness for work inconsistent with her claims. However, Ms. Surratt's ability to care for her brother does not undermine her claimed limitations. She testified that her brother helped her with tasks, not that he posed a hindrance and an additional burden. Ms. Surratt indicated that she could do laundry "one time every 2 to 3 months"[258] and that her brother helped cook meals.[259] Rather than an additional taskload, the testimony characterized Ms. Surratt's brother as a helpmeet who assisted Ms. Surratt to live independently by taking over when her physical limitations prevented her from completing even light household tasks. Because Ms. Surratt testified that she was barely able to perform minimal activities of daily living, she did not contradict her claimed limitations with her testimony. Occasionally doing laundry and an ability to cook with the assistance of a helper are comparable to washing dishes, grocery shopping, and

---

[255]R. at 366; R. at 245, 259, 268, 276, 306-08, 309, 314-16, 332, 337, 346, 401.

[256]R. at 349, 391.

[257]*Clifford*, 227 F.3d at 872.

[258]R. at 136.

[259]*Id.*

vacuuming.[260]  These are activities that courts have repeatedly found insufficient to establish an ability to perform other work.[261]

### G.    Surgery

The ALJ found that Ms. Surratt's reason for refusing surgery (fear that she would be unable to care for her brother were she to become hospitalized or fully immobilized) undermined her credibility, noting that "it is difficult to see how her ability to care for her brother could deteriorate further" and suggesting that because "her Godmother and God sisters were helpful to her" in assisting with daily tasks once, Ms. Surratt should call on them to care for her brother during her hospitalization.[262]

To the extent that surgery is a prescribed procedure, there are only limited reasons permissible for an applicant to refuse surgery.[263]  In order for an ALJ to require surgery as a precondition to benefits, however, the surgery must be both prescribed by a treating source and reasonably expected to have an ameliorative effect on the debilitating condition.[264] Failure to follow a prescribed treatment plan can also undermine an applicant's credibility by suggesting that the condition is not so dire that the applicant feels a need to take ameliorative steps; however, an ALJ

---

[260]*Clifford*, 227 F.3d at 872 (citing *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993)) (noting that activities found inadequate to contradict claims of disabling pain include cooking meals, completing household chores, grocery shopping, carrying groceries, lifting 20-lb sack of potatoes, doing household chores with help, babysitting, and walking 3-5 blocks); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (finding the ALJ's credibility assessment improper where the ALJ used evidence of activities including grocery shopping, washing dishes, and attempts to drive to undermine claimed limitations without considering claimant's qualifications that she experienced difficulty in those activities).

[261]*Id.*

[262]R. at 24.

[263]SSR 82-59 (1982).

[264]SSR 82-59.

may not draw credibility inferences from a failure to follow treatment "unless the ALJ has explored the claimant's explanations as to the lack of medical care."[265]

Dr. Woods suggested that surgery (a C4-C5 discectomy) might help Ms. Surratt.[266] The record does not show to what extent he expected the discectomy to have an ameliorative effect on her condition, and the ME noted at the hearing that the outcome was uncertain.[267] Therefore, the ALJ may not require that surgery as a precondition for awarding benefits. She also may not base her credibility determination on that refusal without an actual exploration (not merely supposition) of the effects of hospitalization on Ms. Surratt's ability to care for her dependent brother, or her godmother's willingness to provide alternative care.[268]

### H.       Reasons for leaving employment

The ALJ found that Ms. Surratt's credibility was undermined by her inconsistent reports regarding why she left employment. Ms. Surratt has reported that she stopped teaching either because she required breathing treatments at work or because the school went bankrupt and could not pay her.[269] She has not explained this discrepancy, and the ALJ is within her discretion to find that the inconsistencies make Ms. Surratt less credible.[270]

---

[265]*Moss*, 555 F.3d at 562 (citing *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) and SSR 96-7p).

[266]R. at 424.

[267]R. at 448.

[268]*Moss*, 555 F.3d at 562.

[269]R. at 160, 214.

[270]*Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

# I.     Depression

Ms. Surratt and the Commissioner disagree on whether the ALJ's determinations about depression relate to credibility or to medical second-guessing.  While it is true that the ALJ's social limitations determination rested in part on her determination about Ms. Surratt's depression, the ALJ did not formulate a new opinion on Ms. Surratt's actual state of mind and, therefore, the question is more properly treated as part of the credibility analysis.

Both Ms. Surratt and the Commissioner agree that the ALJ was in error when she mischaracterized Dr. Gil's report (which included a diagnosis of dysthymia)  as "essentially normal."  The Commissioner, however, believes that this mischaracterization is at most harmless error because Ms. Surratt "never saw a mental health care specialist about her depression" and therefore her reports of depression should not be used in formulating her RFC.[271]  The Commissioner relies on *Sienkiewicz v. Barnhart* for the proposition that failure to see a medical professional for a medical condition undermines reports of a condition.[272]  *Sienkiewicz*, however, is readily distinguishable from this case.[273]  The plaintiff in *Sienkiewicz* had neither sought nor received treatment for depression, although she had sought treatment for numerous other medical conditions and, therefore, her claims of depression were found less than credible.[274]  Ms. Surratt, however, was being treated for depression as well as her other symptoms, albeit not by a specialist.[275]  Contrary to the ALJ's assertion that Ms. Surratt was not taking medication for a mental impairment, Ms.

---

[271]*Sienkiewicz,* 409 F.3d at 804.

[272]*Id.*

[273]*Id.*

[274]*Id.*

[275]*Id.*, R. at 349.

Surratt provided a  list of prescribed medications, with associated dosages and conditions, which showed that medication was being taken specifically for depression.[276]  In fact, Ms. Surratt even pointed out her depression medication at the hearing.[277]  Although her claims of depression would be less credible had she not independently sought care for the condition, it is apparent that Ms. Surratt not only sought care but was prescribed treatment for depression and was following that treatment.  Therefore, this claim does not undermine her credibility.

### III.    Dr. Slodki's Testimony

In her third assignment of error, Ms. Surratt argues that the ALJ erred in step three of the sequential evaluation by mischaracterizing the medical expert's testimony when making her RFC determination.  The Commissioner responds that the ALJ did not mischaracterize testimony but, rather, discounted the portions of the medical expert's opinion that were based solely on Ms. Surratt's self-report rather than on objective medical evidence, after making a finding that Ms. Surratt was not fully credible.

At the hearing, Dr. Slodki opined that based on the objective findings in the record and Ms. Surratt's documented repeated complaints of motor loss, Ms. Surratt was capable of less than sedentary work.[278]  Dr. Slodki also noted the episodic nature of Ms. Surratt's complaints, and pointed out that an RFC would vary from day to day.[279]  The ALJ repeatedly asked Dr. Slodki to use

---

[276]R. at 349.

[277]R. at 442.

[278]R. at 451.

[279]R. at 450.

only the objective evidence, and Dr. Slodki pointed out notes throughout the record indicating left side numbness, tingling, and weakness and periodic imbalance with falls.[280]

It is at this point in the evaluation that the ME's testimony is instructive. His disagreement with the ALJ at the hearing about what constituted "subjective evidence" indicates that the ALJ may have discounted evidence which was objective, rather than subjective. Complaints of pain are always subjective, but documented, repeated, and consistent complaints of pain become more like objective evidence.[281] When the ALJ based her RFC on only what she considered the objective evidence, she was ignoring or discounting evidence that the ME considered objective, including the complaints of pain, weakness, and falls.

This disagreement, however, does not constitute mischaracterization of the testimony. As the ALJ noted, the ME stated that if Ms. Surratt were fully credible, she is "crippled." The ALJ found her partially credible, and also found her partially "crippled." This does not mean that the ALJ believed that the only way to find that Ms. Surratt was disabled was to give her every allegation full credence. Rather, the ALJ used her credibility determination to decide how much weight to give to each piece of evidence, then made a decision based on the entirety of that evidence, not the ME's single statement. This is well within the ALJ's discretion, and not grounds to disturb her decision.

## IV.    Adherence to Social Security Ruling 00-4p

Finally, Ms. Surratt claims that the ALJ failed to adhere to SSR 00-4p, which requires that the ALJ ask the VE whether his testimony is consistent with the DOT. The ALJ is not, however,

---

[280]R. at 449.

[281]*Clifford*, 227 F.3d at 871.

required to ask at every turn whether the VE's testimony is consistent with the DOT. It is sufficient to ask once, so long as the VE is instructed to thereafter point out any deviation from the DOT.[282]

At Ms. Surratt's hearing, the ALJ did ask the VE to testify consistent with the DOT, and to highlight any variation in his testimony.[283] Ms. Surratt claims to be unable to tell which jobs the VE referred to, but in his testimony the VE described the precise duties of each job he considered suited to someone with the RFC described.[284] Ms. Surratt argues that the ALJ has an affirmative duty to inquire about conflicts between VE testimony and the DOT.[285] This is true, but only where there is a facially apparent conflict. Here, the VE described each job in such a way that a reasonable person reviewing his description could tell which of the available laborer positions he was referring to. The ALJ is not required to ensure that Ms. Surratt could perform all of the 5,500 jobs available in the local economy, only that a "significant number" of jobs (sometimes as low as 1,400) are available.[286]

Regardless of SSR 00-4p, however, the VE's testimony is tainted by the improperly formulated RFC. Therefore, even if there is no error in the determination that substantial numbers of jobs exist for that RFC, this is not an answer to whether substantial numbers of jobs exist for Ms. Surratt had her RFC been correctly formulated. A new determination should be made, based on a newly-formulated RFC.

---

[282]SSR 00-4p.

[283]R. at 453.

[284]R. at 456.

[285]*Prochaska*, 454 F.3d at 735.

[286]*Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir.1993).

## CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's June 27, 2008, decision was supported by substantial evidence in at least some particulars of the credibility determination and the weight given to Dr. Slodki's testimony. However, the ALJ substituted her own medical judgment for that of Ms. Surratt's doctors when she substituted a cane for a hemi-cane in formulating the RFC. Although the ALJ adhered to SSR 00-4p and asked the VE whether his testimony conformed to the DOT, the VE's testimony was tainted by the improperly-formed RFC. The record does not compel a finding of disability, but the errors in formulating the RFC are more than harmless. Accordingly, the Court grants Ms. Surratt's Motion for Summary Judgment and remands this matter for further proceedings consistent with the medical evidence of record [dkt. 22].

IT IS SO ORDERED.

_____

U.S. Magistrate Judge
Susan E. Cox


Date:  December 21, 2009